NOTICE
Decision filed 01/20/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 220336-U

NO. 5-22-0336

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Bond County. |
| | ) | |
| v. | ) | No. 18-CF-103 |
| | ) | |
| HOWARD McNECE, | ) | Honorable |
| | ) | Ronald R. Slemer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Presiding Justice Cates and Justice Hackett concurred in the judgment.[*]

**ORDER**

¶ 1    *Held*: We affirm the defendant's conviction where the trial court did not abuse its discretion in its rulings regarding the admission of video evidence; the exclusion of testimony as a discovery sanction was harmless error; there was no cumulative error regarding the trial court's denials of the defendant's motions for mistrial; and all other issues raised by the defendant were forfeited.

¶ 2    The defendant, Howard McNece, was convicted of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2016)) after a jury trial held on February 28, 2022, through March 2, 2022. The defendant was sentenced to 48 months' probation and 12 months' incarceration in the Bond County jail, with the last 6 months' incarceration stayed.

_____

[*]Justice Welch participated in oral argument. Justice Hackett was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

¶ 3 The defendant now appeals his conviction arguing that the trial court erred in denying his motion for a new trial where the motion alleged that the trial court erred in: allowing the admission of video evidence; excluding testimony as a discovery sanction; failing to properly address concerns that the jury could hear discussions between the judge and counsel; and, denying the defendant's motions for mistrial made during trial. The defendant argues that these errors deprived him of a fair trial. For the following reasons, we affirm the judgment of the trial court.

¶ 4                                              I. BACKGROUND

¶ 5 The defendant was originally charged by information on August 16, 2018, with two counts of aggravated criminal sexual abuse in violation of section 11-1.60(b) and (d) of the Criminal Code of 2012 (720 ILCS 5/11-1.60(b), (d) (West 2016)). Just prior to trial, the State filed a third amended information, charging only one count of aggravated criminal sexual abuse (*id.* § 11-1.60(d)), a Class 2 felony. The count alleged that on or between July 15, 2017, and September 15, 2017, the defendant committed an act of sexual conduct with C.R.P. (dob: 12/19/2003), who at the time was at least 13 years of age, but under 17 years of age, in that the defendant "knowingly touched the vagina of C.R.P. (dob: 12/19/2003), for the purpose of the sexual arousal of the defendant, and the defendant was at least five (5) years older than C.R.P. (dob: 12/19/2003), in violation of 720 ILCS 5/11-1.60(d)."

¶ 6 On October 25, 2018, the trial court ordered the State to provide the defendant with discovery "pursuant to Supreme Court Rules without further Order within 14 days." It also ordered the defendant to provide the State with discovery "pursuant to Supreme Court Rules without further Order within 14 days of receipt of People's discovery."

¶ 7 On October 31, 2018, the State filed a certificate of compliance with discovery wherein it certified that various items of evidence had been tendered to defense counsel. The defendant did

2

not provide discovery to the State within 14 days thereafter. Instead, the defendant filed a motion on November 5, 2018, to continue the jury trial which had been scheduled for January 7, 2019, to a future date. On December 19, 2018, the January 7, 2019, jury trial setting was vacated pursuant to that motion. Multiple status hearings occurred thereafter, which caused additional continuances. The defendant obtained new counsel on June 19, 2020.

¶ 8       On August 12, 2020, the State filed a motion for pretrial discovery pursuant to Illinois Supreme Court Rule 413(b), (c), and (d) (eff. July 1, 1982) and Illinois Supreme Court Rule 415(b) (eff. Oct. 1, 1971). The motion asked that the defendant give written notice of "any defenses, affirmative and non-affirmative, which the defendant intends to assert at any hearing or at trial." It also requested that the defendant provide "the names and last known addresses of person[s] the defendant intends to call as witnesses, together with their relevant written or recorded statements, including memoranda reporting or summarizing their oral statement." It further requested that the defendant provide "any written or recorded statements, including memoranda reporting or summarizing the oral statements" of any persons listed by the State as potential witnesses.

¶ 9       On September 8, 2020, defense counsel certified that he had provided his answer to discovery. On March 10, 2021, defense counsel certified that he had provided the State with his supplemental answers to discovery. On July 6, 2021, the State filed its "People's List of Potential Witnesses," wherein it listed Justin McNece, the defendant's son, as a potential trial witness.

¶ 10      The defendant filed a speedy trial demand on November 12, 2021. On December 28, 2021, the trial court entered a pretrial order, indicating that the parties would discuss and resolve discovery compliance at the final pretrial hearing on January 11, 2022. Further, all motions were to be resolved prior to January 17, 2022, and jury selection was to begin on January 24, 2022.

3

¶ 11　On January 10, 2022, the defendant filed his witness list wherein he included Justin McNece as a potential witness. On January 11, 2022, the State filed an amended witness list, with Justin McNece no longer listed as a potential witness, and its first motion *in limine* regarding "general trial matters." The motion *in limine* included paragraph I. with the heading, "Motion *In Limine* to Bar Argument of Any Undisclosed Defenses," with a subpart C asking the trial court to "preclude the defendant from presenting any evidence related to or arguing any undisclosed affirmative defenses not filed in advance of trial."

¶ 12　At the pretrial hearing on the same day, January 11, 2022, the trial court's docket entry indicated that it was informed by the parties that "everything is proceeding smoothly," and that "minor issues on motions *in limine* will be sorted out by the attorneys" and pending matters would be addressed by the trial court at a future date. The parties were further advised that jury selection would begin on January 24, 2022.

¶ 13　On January 14, 2022, the defendant filed an amended witness list which again included Justin McNece as a potential witness. The defendant also filed a notice of affirmative defenses, which stated that the defendant intended to assert the affirmative defense of "Ignorance or Mistake pursuant to 720 ILCS 5/4-8." Additionally, defense counsel filed a certificate stating that he had provided the State with a "2nd Supplemental Answer to Discovery." While the second supplemental disclosure is not in the record, the State represented at multiple hearings that the disclosure indicated that Justin McNece would testify regarding his relationships with C.R.P., C.R.P.'s mother, and the defendant. He would also testify regarding his recollection of the alleged incident, matters related to the Illinois Department of Children and Family Services (DCFS) investigation, and the defendant's alcohol consumption.

¶ 14    Due to a spike in incidences of COVID-19, on January 18, 2022, the trial court continued the jury trial to February 28, 2022, with a final pretrial date of February 8, 2022. The trial court's docket entry regarding the February 8, 2022, final pretrial hearing states that with respect to the State's general motion *in limine*, "Roman Numeral I was agreed to by the parties and allowed." The docket entry also indicated the trial court ruled on the State's other motions *in limine*, and further indicated that the attorneys advised that "everything is in compliance."

¶ 15    On February 18, 2022, the defendant filed his exhibit list and a motion *in limine* to exclude the recorded interview of the defendant. He argued that the audio and video recording of the interview of the defendant, conducted on May 29, 2018, by Detective Unterbrink, should be suppressed because the detective made "numerous statements vouching for the credibility of the complaining witness and offer[ed] his personal belief regarding the merits of the issues of fact." The defendant further alleged that the video recording indicated that Detective Unterbrink stated, "he has no doubt that 'this' happened, that the incident took place." The defendant additionally claimed that the video showed Detective Unterbrink stating that he did not believe the defendant and believed the complaining witness. The defendant finally alleged that the video was not relevant, that it contained improper opinions, and that it was more prejudicial than probative.

¶ 16    On February 22, 2022, the trial court made a docket entry noting that the defendant's motion *in limine* of February 18, 2022, was filed on a Friday afternoon, with the following Monday being a holiday. The trial court stated, "Several pretrial orders had been entered and several

5

conferences were concluded. Nevertheless, [defense counsel] acted in this fashion." The trial court then ordered a special setting for a hearing on all motions to take place on February 23, 2022.[1]

¶ 17    Prior to the February 23, 2022, hearing, the State filed a "5th Supplemental Compliance With Discovery," and a list of exhibits. On the day of the hearing, the State filed a motion *in limine* asking the trial court to bar any reference to the defendant's brain injury and any argument of an affirmative defense of intoxication. The State argued in the motion that the defendant's notice of affirmative defense of January 14, 2022, was vague, and the State could only surmise that the defendant intended to pursue an affirmative defense related to a lack of mental capacity based on "an alleged traumatic head injury" and "the affirmative defense of intoxication." The motion *in limine* asked the trial court to bar any reference to a lack of mental capacity because no discovery had been provided on those issues.

¶ 18    The hearing on both the defendant's motion *in limine* to exclude the video of his interview with Detective Unterbrink and the State's motion *in limine* to bar any affirmative defenses relating to mental capacity took place on February 23, 2022.[2] Prior to hearing argument on the motions, the trial court addressed defense counsel, asking, "You have attended pretrials on this cause, haven't you?" Defense counsel indicated that he had, and the trial court then asked, "And you heard my pretrial orders; correct?" Defense counsel confirmed that he had heard the trial court's pretrial orders. The trial court then proceeded to argument on the motions.

---

[1]It is noteworthy here that the State filed its "4th Supplemental Compliance With Discovery" on February 7, 2022, wherein it disclosed a Bond County Sheriff's Department supplemental report and a "DVD-R containing body camera footage."

[2]On the date of the pretrial, the State also filed its "Amended List of Exhibits," which included the "DVD-R containing audio/video interview of Howard McNece on May 29, 2018." Additionally, the State moved to amend the information to dismiss count II.

6

¶ 19    Regarding the defendant's motion *in limine*, defense counsel argued that the video of the defendant's interview included highly prejudicial statements made by Detective Unterbrink over a period of approximately two minutes. Defense counsel specifically identified five of Detective Unterbrink's statements. One of the statements by Detective Unterbrink indicated there was no doubt in his mind that the crime happened, stated twice. Another highly prejudicial statement confronted the defendant, saying he touched the victim's vagina, and then pursued the details of the alleged event. Additionally, Detective Unterbrink indicated that what happened, happened, and the defendant held the answers as to why. Finally, Detective Unterbrink stated that he did not believe the defendant's assertion that he did not touch C.R.P. Defense counsel argued that the video evidence was irrelevant and that it was unfairly prejudicial to the defendant. Defense counsel requested the video be excluded from trial in its entirety, as the officer was available to testify to the defendant's statements. Alternatively, the video could be redacted to edit out the prejudicial statements. The State argued that the video was admissible in its entirety, as it was relevant and law enforcement was allowed to use techniques to interview defendants. Further, the video represented the best evidence of the defendant's statements, as opposed to the testimony of Detective Unterbrink.

¶ 20    Regarding the State's motion *in limine*, the State argued that it could not fulfill its disclosure duties without more specificity regarding the affirmative defense disclosed by the defendant. The State was unclear what affirmative defense was going to be offered at trial, positing that it could be a mistake as to consent, a mistake as to age, a mistake as to the law, or something else. The State argued that the only discovery it had received from the defense were pictures of the couch area where the alleged crime occurred and a small summary of Justin McNece's expected

testimony regarding the defendant's alcohol consumption. The State repeatedly indicated that it did not know what the affirmative defense would be at trial.

¶ 21    Defense counsel clarified that there would be no affirmative defense regarding mental capacity or intoxication, and explained that the mistake or ignorance affirmative defense was based on the theory that the defendant believed that C.R.P. wanted a foot massage, and that this belief negated the mental state of the defendant where an element of the charge was that the touching was done for the purposes of sexual gratification or arousal. The State argued that a belief that C.R.P. had invited the defendant to massage her feet would not qualify as an affirmative defense and that it should be stricken.

¶ 22    The trial court made an oral ruling denying the State's motion *in limine* and took defense counsel's motion *in limine* under advisement. The next day, February 24, 2022, the trial court denied both motions *in limine* by written order. It noted the tardiness of defense counsel's motion *in limine* and ordered, among other things, that the defendant's request to bar the video of his interview was denied. The order also denied the State's motion *in limine*, noting that the defendant had "clarified his defense of mistake to show [defendant] gave victim a foot massage."

¶ 23    Also on February 24, 2022, after the courthouse had closed due to weather conditions, defense counsel electronically filed a certification that he had served the State with a "3rd Supplemental Answer to Discovery." The third supplemental disclosure is not in the record, but the defense made offers of proof, discussed below, indicating that the third supplemental disclosure informed the State that the defendant would introduce a statement by Justin McNece that provided a motive for the complaining witness to lie about her accusation and that was a prior inconsistent statement for the purposes of impeachment.

8

¶ 24    On February 25, 2022, the State filed a motion *in limine* stating that it had received the defendant's third supplement to discovery, and asked the trial court to bar any reference to the new information contained therein. The motion *in limine* noted the various discovery orders and court appearances that had occurred, highlighting that the State had filed a formal motion for discovery on August 12, 2020, after having received no discovery since the initial discovery order of December 25, 2018. The State's motion also emphasized that the defendant's "3rd Supplemental Answer to Discovery" was made after the courthouse had closed at 3:44 p.m. on Thursday, February 24, 2022, with the jury trial scheduled to begin on Monday, February 28, 2022.

¶ 25    The jury trial commenced on February 28, 2022. After jury selection, the trial court heard the State's motion *in limine* to bar any reference to the "newly provided information" contained in the defendant's third supplemental discovery response. Specifically, the State referred to the disclosure that Justin McNece was going to testify to statements made by the victim.[3] During that hearing, defense counsel argued that he was under no obligation to have disclosed the newly provided information, specifically the single statement alleged to have been made by C.R.P. to Justin McNece indicating that C.R.P. had lied in her accusation of criminal conduct by the defendant. Defense counsel did not have a writing relating to the statement, and only had notes of his discussion with Justin. Defense counsel stated that he disclosed the statement out of an abundance of caution because, at the final pretrial, the State had indicated that the discovery disclosure relating to Justin's testimony was vague.

¶ 26    The State then responded that defense counsel should be required to provide his notes concerning Justin's statement to show when the interview took place and what Justin had said

---

[3]The actual third supplemental disclosure is not in the record.

regarding the alleged inconsistent statement by C.R.P. The State emphasized that if the interview had taken place prior to January 14, 2022, the date that defense counsel had disclosed the general subject matter of Justin's testimony and the defendant's affirmative defense of mistake or ignorance, then the defendant should be sanctioned.

¶ 27    In response, defense counsel informed the trial court that Justin had disclosed the statement in an interview that took place between January 14, 2022, and February 23, 2022. Defense counsel was unsure of the specific date of the discussion, but stated twice during the hearing that he "knew" it was after January 14, 2022. He stated that he did not disclose the information at the motion hearing on February 23, 2022, because he did not believe he was obligated to do so in the absence of having the statement in writing. Defense counsel argued that any unfair surprise to the State was not prejudicial and stated, "Even if it were, the only sanction would be—appropriate would be a continuance; and, again, given the nature of this disclosure, which I strongly believe was not required and the fact that it's a prior inconsistent statement doesn't demand a continuance in this case." The defendant requested the opportunity to make an offer of proof at the hearing, but the trial court indicated, "Not today."

¶ 28    The State asked the trial court to bar any reference to the alleged statement by C.R.P. as a sanction, or, in the alternative, to order disclosure of defense counsel's notes reflecting when the statement was provided to the defense. The trial court granted the State's motion *in limine*, stating to defense counsel, "I don't believe you're in compliance with Illinois law or Illinois rules. I don't think you fulfilled your obligation so the motion *in limine*—why you chose to operate in that fashion—but it's granted." Further, the trial court's docket entry of February 28, 2022, indicates that it found that the defendant "was not in compliance with court orders or Illinois law."

10

¶ 29    The next day, March 1, 2022, the defendant filed a motion to reconsider the trial court's ruling. The parties gave opening statements to the jury prior to the hearing on that motion. Near the conclusion of defense counsel's opening statement, the following exchange occurred:

"DEFENSE COUNSEL: I ask you that you hold the State to their burden. During the trial, it is imperative that you pay attention to the evidence that is presented to you or the lack of evidence that is presented to you. Further, evidence that is more than just he said/she said.

PROSECUTOR: Objection.

THE COURT: Objection sustained, [defense counsel].

DEFENSE COUNSEL: Pay attention to the—

THE COURT: [Defense counsel], did you hear the objection?

DEFENSE COUNSEL: I did.

THE COURT: Did you hear my ruling?

DEFENSE COUNSEL: I did, Your Honor.

PROSECUTOR: I would ask that that be stricken, sir.

THE COURT: [Defense counsel], contain your opening statement here.

DEFENSE COUNSEL: May I move on, Your Honor?

THE COURT: Yes.

DEFENSE COUNSEL: Pay attention to the thoroughness of the investigation by the Bond County Sheriff's Department and the Department of Children and Family Services. You'll hear quite a few witnesses testify. Listen to their testimony. See if there is any motive behind their testimony. Look to see what physical evidence, if any, is presented to you. Look and see—look at the scientific

11

evidence or lack thereof that's presented to you.

PROSECUTOR: Objection, Judge.

THE COURT: On what basis?

PROSECUTOR: May we approach?

THE COURT: Let's go back there. No court reporter, though.

DEFENSE COUNSEL: I prefer it be on the record, Your Honor.

THE COURT: No, it's an objection.

(Whereupon, a recess was taken.)

THE COURT: Everybody have a seat. The objection will be sustained. I would admonish the attorneys to contain their opening statements. They will have an opportunity for closing argument at the end of the case. [Defense counsel], do you understand that?

DEFENSE COUNSEL: Yes, Your Honor.

THE COURT: [Defense counsel], look at me. Do you understand it?

DEFENSE COUNSEL: Yes, Your Honor.

THE COURT: [Prosecutor], do you understand that?

PROSECUTOR: Yes, sir.

THE COURT: Proceed, [defense counsel].

DEFENSE COUNSEL: I apologize, Your Honor. Given the way the jury is—

THE COURT: [Defense counsel], I think it's appropriate when the judge addresses you is for you to look at the judge instead of keeping your back to the judge.

12

DEFENSE COUNSEL: Sure, Your Honor.

THE COURT: You're sure?

DEFENSE COUNSEL: Yes. May I move on?

THE COURT: Proceed, [defense counsel].

DEFENSE COUNSEL: Thank you. After all the evidence has been presented, I'll get one more opportunity to have a discussion with you. And at that time I will ask that you find [the defendant] not guilty. Thank you."

¶ 30 After opening statements, the trial court heard the motion to reconsider its ruling on the State's motion *in limine* to bar reference to the statement by Justin McNece that provided a motive for C.R.P. to lie about her accusation against the defendant. The defendant sought to introduce this statement to provide evidence of C.R.P.'s motive to lie and as a prior inconsistent statement for the purpose of impeachment. During argument on the motion to reconsider, defense counsel stated that he had interviewed Justin on January 10, 2022. Defense counsel also stated that the notes from the interview did not contain Justin's verbatim statement, but defense counsel offered to provide his notes to the trial court for an *in camera* review. More importantly, defense counsel argued that the State had never filed a motion pursuant to Illinois Supreme Court rules requesting defense counsel's notes, and the trial court had never entered an order requiring production of defense counsel's notes. The State's argument focused on defense counsel's duty to supplement discovery, and the delays in providing discovery, although the State acknowledged that the September 8, 2020, discovery response of the defendant included Justin as a potential witness.

¶ 31 The trial court denied the defendant's motion to reconsider, stating that its ruling was not solely based on the untimeliness of the disclosure, but "was based on the totality and entirety of this case, orders, and Illinois law." The trial court noted that there had been numerous pretrial

13

hearings and numerous requests by the State, and even requests by the trial court, to ensure that all required discovery was complete. The trial court stated, "[O]n the eve of trial and even during trial, you chose to act in that fashion. Therefore, under those circumstances, the Court thinks it has no other choice. The way you have acted in proceeding to continue with the Motion *in Limine*, so the Motion *in Limine* will stand."

¶ 32    After the hearing on the motion to reconsider, defense counsel made multiple motions for mistrial. He first stated that the trial court had admonished defense counsel and yelled at him in front of the jury during his opening statement, and then also during a break. Defense counsel claimed the trial court's admonishments potentially tainted the trial and swayed the jury. He argued that this would constitute grounds for a mistrial. The trial court responded that it had advised defense counsel that the objection during his opening statement had been sustained, yet defense counsel continued to disregard the ruling and the trial court corrected him to ensure he understood that the objection had been sustained. The trial court then denied the motion for mistrial.

¶ 33    Defense counsel then argued that because only one of the defense attorneys had been introduced at the start of trial, this showed the trial court's disdain for the defense attorneys and for the defendant. He also stated for the record that there was an incident where defense counsel had been in chambers, and when they exited a door leading into a hallway, there were jurors in the hallway. He stated that the trial court told defense counsel to close the door behind them "in a certain tone," and that some of the jurors in the hallway reacted with "smirks [and] some giggles." Defense counsel again asked for a mistrial, stating that the defendant's right to a fair trial had been violated. The trial court explained that when defense counsel left chambers, they left the door to the hallway wide open, and the judge had to close the door. The trial court further stated that it was a matter of courtesy to let defense counsel introduce the people from the defense side in

14

whatever fashion they preferred. The trial court went on to state that the courtroom was big and the jurors were "everywhere," so they had been speaking with volume so that all of the jurors could hear, and that it was appropriate and necessary to do so.[4] The trial court also denied this motion for a mistrial.

¶ 34    After this hearing, the State presented testimony from C.R.P., who began by indicating that when she was 13 years old, she attended Greenville Junior High. C.R.P. testified to her birth date and offered some general information about herself. She then indicated that in August 2017, her mother, Molly Jones, was dating the defendant's son, Justin McNece, and had been dating him for seven to nine months, spending almost every day together. C.R.P. described her relationship with Justin as "super close." He was always around her and they would go bowling, to the movies, and would hang out at C.R.P.'s house or at Justin's parents' house. Justin had two children who, at that time, were three and six years old. C.R.P. spent time with Justin's parents, the defendant and his wife, Johnnie McNece, almost every Tuesday and Thursday, because those were the days when Justin had visitation with his children. C.R.P. looked at the defendant and Johnnie like grandparents. Justin's grandmother, Eva, who suffered from Alzheimer's disease, also lived with the defendant and Johnnie.

¶ 35    C.R.P. stated that on Thursday, August 31, 2017, she was at the home of the defendant and Johnnie in Bond County. After dinner, C.R.P.'s mother and Justin were outside working "on a car or boat or something," and Johnnie was outside watching the other children. After playing outside, C.R.P. went into the house. Once inside, she helped Eva to her chair where she fell asleep. C.R.P. took off her shoes and socks and got her book to read and sat on the couch. She propped her knees

---

[4]The jury trial in this case took place during COVID restrictions that required the jurors to be separated from one another.

up on the cushion of the couch and covered her lap from her waist to her knees with a blanket. C.R.P. indicated she was wearing athletic shorts that were "black and had a bunch of white dots on them" that were in a Chevron pattern. She identified a photo of herself, taken a week after the alleged incident, which depicted her in the same athletic shorts. C.R.P. then went on to relate that the defendant came into the living room with a beer bottle in his hand and sat on the couch near her. She believed that he had been at a local bar since, every Tuesday and Thursday, for eight months, she had seen the defendant either drinking at home or leaving to go to the bar. At the point he arrived in the living room that day, C.R.P. had begun watching television.

¶ 36 C.R.P. testified that the defendant reached over and grabbed C.R.P.'s foot and began massaging her feet. The defendant then moved up C.R.P.'s leg to her shin and continued to rub both of her shins and feet. She did not move or say anything because she was scared and in shock. At one point she tried to move her feet, but the defendant "grabbed my foot really hard so after that I just quit moving." C.R.P. felt that the touching was not normal and made her uncomfortable, but she did not "know if it was necessarily wrong." Using a chair to demonstrate for the jury, C.R.P. showed how she was positioned on the couch in relation to the defendant.

¶ 37 After more than 15 minutes, and more like 30 to 40 minutes, of the defendant rubbing below C.R.P.'s knees, she testified the defendant lifted the blanket on her lap and with his hand "went from thigh to thigh all the way up to my vagina and then he grabbed my vagina." C.R.P. explained that the defendant touched her vagina over her shorts. After that, the defendant grabbed C.R.P.'s thigh and moved closer to her, whispering in her ear, "You're a pretty girl you know that." C.R.P. then got up from the couch, ran to another area that was out of view of the defendant, and stood there for a short time because she was "freaking out." Eventually she exited the front door and told her mother that they needed to go home because the defendant had touched her.

16

¶ 38 C.R.P. testified that she never put her feet on the defendant and did not invite him to touch her. She did not ask for a foot massage. Prior to this incident, C.R.P. stated that the defendant had never touched her before.

¶ 39 After C.R.P. told her mother that the defendant had touched her, C.R.P.'s mother called Justin over and C.R.P. told him about the incident. C.R.P. stated that Justin was apologetic and understanding about what had happened. Johnnie came over and C.R.P. told her what had happened. Johnnie said that the defendant would not do that and went inside the house. C.R.P.'s mother went inside and collected C.R.P.'s belongings, and the family went home. Justin and C.R.P.'s mother continued to date, and Justin moved into their home sometime in September 2017, about a month after the incident with the defendant. C.R.P. said that she and Justin maintained a good relationship. Justin and C.R.P.'s mother broke up around August or September 2018, and Justin moved out.

¶ 40 During cross-examination, defense counsel asked C.R.P. to demonstrate how the defendant had changed positions from sitting on the couch cushion farthest away from her to whispering in her ear. Defense counsel asked C.R.P. if the defendant gradually slid over next to her or if he had laid down next to her. C.R.P. testified that she thought the defendant had gradually made his way over next to her as he made his way up her legs, and that he may have leaned over but he was never fully lying down. Defense counsel asked C.R.P. if her feet were still on the cushion at that time, and C.R.P. stated that by that point her feet were not on the couch. Defense counsel asked C.R.P. to demonstrate how she was positioned while the defendant was touching her and C.R.P. stated that she would rather not.

¶ 41 C.R.P. had been interviewed by DCFS at the time of the incident, and defense counsel asked her what she had reported was on the television at that interview. She stated that she was

sure that Wheel of Fortune had been on, but could not remember what else was on after that show ended. C.R.P. was asked repeatedly by defense counsel to confirm that she did not attend a soccer game that day, and C.R.P. agreed. She was also asked to confirm that she had gone outside after dinner but prior to the incident, and C.R.P. confirmed that she had been outside for approximately 30 minutes after eating dinner. Defense counsel also asked C.R.P. to provide details as to the beverage the defendant was drinking that day, and C.R.P. confirmed that she recalled him having a bottle of beer with a green label.

¶ 42    The State next presented testimony from C.R.P.'s mother, Molly Jones. Relevant to this appeal, Molly testified that she, C.R.P., and the other children were at a soccer game prior to going to the defendant's home on the day of the incident. She also testified that the time period C.R.P. was inside the home during the incident was 5 to 10 minutes.

¶ 43    During Molly's testimony, defense counsel made an objection and a sidebar occurred. Due to COVID-19 accommodations, sidebars were conducted in the law library adjacent to the courtroom. During this particular sidebar, after the objection was resolved, defense counsel stated that the defendant had informed him that during the sidebar, the jury could hear voices from the law library, although defense counsel was unsure whether the exact words could be heard or just voices. The State confirmed that one of the courtroom bailiffs had reported that voices could be heard when they were raised. The bailiff was asked whether voices could be heard inside the courtroom while the sidebar was occurring. The bailiff indicated that voices could be heard, but the words being said could not be made out or understood. He stated that the voices could "just barely" be heard. Defense counsel stated that the defendant said he could hear yelling and that some of the jurors' "eyes got very large." The bailiff stated that he did not hear yelling. At that time, nothing further was stated regarding this issue and Molly's testimony resumed.

18

¶ 44   After Molly's testimony, defense counsel made offers of proof. First, he stated that during cross-examination, he would have asked C.R.P. if Justin watched her between May 2018 and July 2018, on Saturday evenings when Molly was at work. Defense counsel would have expected her to admit that this did occur. He would have asked if, on one of those Saturdays, C.R.P. and Justin had argued over cleaning up after dinner. Defense counsel anticipated that C.R.P. would either deny the argument or not recall it. He would have asked if, during that argument, C.R.P. stated, "I've done everything I can to split you and my mother up even lie about your dad." Defense counsel anticipated that C.R.P. would have denied making the statement.

¶ 45   Defense counsel's next offer of proof related to Molly's testimony. He stated that he would have asked Molly if C.R.P. had a reputation for complaining about Molly's prior boyfriends and not having enough time with her mother as a result of those relationships. Defense counsel anticipated that Molly would not have been able to answer. He would also have asked if C.R.P. ever complained about Molly's relationship with Justin taking time away from Molly's relationship with C.R.P. as alleged in the DCFS report. Defense counsel anticipated that Molly would not recall that. He also would have asked Molly if Justin had ever confronted her about C.R.P.'s alleged statement that she had lied. The State objected to this offer of proof, arguing that it would have been improper impeachment, as there would be no witness to perfect the impeachment. The trial court noted that the State's objection as to foundation had been sustained and remained in effect.

¶ 46   The State then called the DCFS investigator, John Bowman, and Detective Steven Unterbrink. After their testimony, the State rested. The defense made a motion for a directed verdict, which was denied.

19

¶ 47    The defense then called its first witness, Johnnie McNece, the defendant's wife. Relevant to this appeal, Johnnie testified that the defendant only ever drank Keystone Light beer out of a can. She also testified that the time period that C.R.P. was inside the home during the incident was 5 to 10 minutes. During Johnnie's testimony, the State attempted to impeach her with statements from a video that had been unofficially transcribed. The following occurred:

"DEFENSE COUNSEL: Your Honor, I'm going to object. This is improper impeachment of a witness.

THE COURT: In what way?

DEFENSE COUNSEL: She's telling her what she's saying not asking her what she's saying. The witness has no opportunity to view the statements that she's alleged to have made.

PROSECUTOR: If you want me to go get the audio video recording and play it for her, I'm more than happy to play it for the jury. More than happy to do that.

THE COURT: [Defense counsel].

DEFENSE COUNSEL: This isn't relevant to the specific impeachment she is trying to make. An entire video on this issue isn't proper for the impeachment. Additionally, she needs an opportunity to at least see what she is being alleged— what [the prosecutor] is reading.

THE COURT: [Prosecutor], what are you reading?

PROSECUTOR: I'm reading the specific prior inconsistent statement. If you want me to play the prior inconsistent statement, I'm more than happy to.

THE COURT: Do you have a signed statement?

PROSECUTOR: It's an audio video recording. I'm happy to play it. This is a transcript of that audio video statement.

THE COURT: But not a transcript prepared by a court certified reporter?

PROSECUTOR: No, sir. I'm happy to play it. This was prepared by my office staff. I'm happy to get the video and play it and we can watch it and she can tell me if that is the audio video statement.

THE COURT: Okay. [Defense counsel], any objection to her doing that?

DEFENSE COUNSEL: Yes, Your Honor, because, again, it's the way that she's telling the witness of her prior—prior statements.

PROSECUTOR: Happy to put it on the screen. Can do that right now, sir. It's going to take me a moment to queue it up.

THE COURT: All right. Did you want to ask any more questions before you do that?

PROSECUTOR: I have several.

THE COURT: Why don't we do that. Ask your questions.

DEFENSE COUNSEL: I'll withdraw my objection, Your Honor. I'll withdraw my objection."

¶ 48    Shortly thereafter, a break took place where the video at issue was prepared for presentation during questioning. After the break, the State resumed questioning Johnnie, and nothing unusual about the break was noted by defense counsel or anyone else present in the courtroom.

¶ 49    At the start of the proceedings the next day, March 2, 2022, defense counsel made another motion for a mistrial. He argued that the colloquy during Johnnie's testimony regarding the video, set forth above, constituted an improper speaking objection by the State in the presence of the jury.

21

He further stated that during the break when the video was being prepared, the jury was permitted to stay in the room, and portions of the video played during that time. The State responded that the video had not played, as it was not connected to the screen. Defense counsel argued that his back was to the screen, but that he could hear audio from portions of the video while it was being prepared, and this deprived the defendant of his right to a fair trial. The trial court noted that all of the attorneys were in the room at the time of the occurrence and if anyone had an objection or wanted the jurors removed, they could have requested it at that time rather than the next day. The court denied the motion for mistrial.

¶ 50    The defendant then testified on his own behalf. He stated that he had only met C.R.P. three times, and only one of those occasions had been at his home. Regarding the alleged incident, he stated that C.R.P. put her foot on his leg and he massaged her leg and that was it. He testified that he massaged her feet for 5 to 10 minutes, and he never went above the knee. He denied saying any words to her. He testified that he had been drinking at the time, but he was not drunk. He denied touching C.R.P.'s vagina. He denied knowing what grade she was in at school. When he was shown a photograph of C.R.P., the defendant denied recalling what C.R.P. looked like and stated that he only knew she was a girl. He did not recall how many times she had been to his house. He stated that he could not remember what C.R.P. looked like because it was not important. He also testified that he did not know C.R.P.'s age because she was an acquaintance and it was not important.

¶ 51    Justin also testified on behalf of the defense. Relevant to this appeal, Justin testified that C.R.P. had a problem with him and that she was very hostile at times and there was a lot of conflict. He stated that for the entire duration of his relationship with Molly, his relationship with C.R.P. was never good and she would cause problems. He stated that he watched C.R.P. push the other

22

children around and tell them what to do, and that she was a problem for everyone. He testified that C.R.P. did not feel comfortable around the defendant because they did not get along. When asked why not, he explained that the defendant and C.R.P. would talk politics, and C.R.P. would get flustered. He also testified, "She did things to retaliate against authority figures." Justin also testified that the defendant only ever drank Keystone Light out of a can, and that the time period C.R.P. was inside the home during the incident was 5 to 10 minutes.

¶ 52    After Justin's testimony, defense counsel made another offer of proof. He stated that Justin would have testified that he and his children moved in with Molly and C.R.P. at some point after the allegations but prior to August 2018. He would have testified that his relationship with C.R.P. was volatile and hostile. He would have testified that he sometimes watched the children, including C.R.P., on Friday and Saturday nights if Molly was working. He would have testified that between May 2018 and the end of the relationship, he got into an argument with C.R.P. over cleaning up after dinner and her being disobedient. His testimony would have been that during this argument, C.R.P. yelled at him, "I did everything I could to get you and my mom to split up even lie about your dad," and then went to her room and slammed her door. He would have also testified that he and Molly broke up because of an argument regarding C.R.P. unrelated to the case. Defense counsel stated that the testimony would have been offered to impeach C.R.P. with a prior inconsistent statement and to provide a motive.

¶ 53    The jury instruction conference then took place, followed by closing arguments. During his closing argument, defense counsel, among other things, called into question the feasibility of C.R.P.'s account of events, scrutinized her memory, emphasized how other testimony contradicted hers, highlighted details that would have been relevant but were not included in her testimony, criticized her behavior as inconsistent with someone who had been improperly touched, and

23

pointed out inconsistencies in her demeanor during trial. Defense counsel also reiterated that the defendant denied that the event had occurred, and stated that the situation was "a he said/she said case without any more proof." After deliberation, the jury found the defendant guilty of aggravated criminal sexual abuse.

¶ 54    The defendant filed a motion for a new trial on March 31, 2022. He argued that the trial court erred in denying his motion *in limine* regarding the defendant's recorded interview; erred in granting the State's motion *in limine* to bar reference to the alleged statement of C.R.P. and denying the defendant's motion to reconsider the same; erred in denying the defendant's motions for mistrial, including his motions for mistrial relating to a speaking objection during Johnnie's testimony and an incident where the jury heard audio recordings during a recess; and, erred in failing to question the jurors regarding their ability to hear discussions conducted outside the presence of the jury.

¶ 55    The hearing on the motion for a new trial occurred on May 3, 2022. In denying the motion, the trial court gave further explanation as to its ruling regarding the exclusion of evidence, stating as follows:

"I have been involved in many jury trials in the Third Judicial Circuit over the last 44 years. One of the biggest complaints that jurors have is the delay, the time they spend waiting for things to take place in the courtroom or by the attorneys, and I admonished both of these attorneys when it appeared this matter was going to trial back in September, October, November, December, January, February, that was not going to happen. It's unfair to the jury. They take time out of their lives to come here and provide a valuable service. I don't know what the rationale is for an attorney to think that they can wait until the last minute to do something. I don't

24

know what it's for, if it's not being prepared or see[k]ing to gain some tactical advantage, but the attorneys were admonished many times that discovery had to be completed, everything had to be done so that we could hit the ground running and proceed to jury trial.

I was somewhat amazed how things trickled out in this case by the defendant; and I—but the defendant was given a fair trial under the circumstances. Everything was appropriate. *** This trial started—I would also point out that this matter was supposed to start trial in January. I would point out that for the—that, basically, in mid-March of 2020 we entered the restrictions of COVID that made it difficult to proceed in the criminal cases, has made it almost impossible to proceed with jury trials.

During those COVID restriction, I have been involved in two jury trials. It has been difficult. I believe we have done them very well under the circumstances that we were dealing with. Originally the trial was supposed to start at the end of January; however, as the incidence of COVID spiked, it was not appropriate to put the jurors at risk and make them worry and—by proceeding to trial in January; therefore, the February day was selected, and this matter did start trial on February the 28th, and it came back with a verdict by the jury of guilty on March the 2nd. Therefore, the defendant's Motion for Mistrial is denied."

¶ 56    The trial court then proceeded to sentencing that same day and sentenced the defendant to 48 months' probation and 12 months' incarceration in the Bond County jail, with the last 6 months' incarceration stayed. The defendant filed a timely notice of appeal on May 27, 2022.

25

II. ANALYSIS

¶ 58    On appeal, the defendant raises four arguments: (1) that the trial court erred by allowing the State to publish an exhibit containing prejudicial statements made during the defendant's interrogation by Detective Unterbrink; (2) that the trial court erred by barring reference to the alleged statement of C.R.P. as a discovery sanction; (3) that the trial court failed to properly address concerns that the jury could hear discussions between the judge and counsel; and, (4) that there was cumulative error based on the trial court's improper denial of the defendant's requests for a mistrial. We will address these issues in the order raised.

¶ 59                A. Admission of the Defendant's Interrogation Video

¶ 60    First, the defendant argues that he was denied a fair trial when the trial court denied his February 18, 2022, motion *in limine*, which sought to exclude or redact the recorded interview of the defendant. The defendant argues that the video included prejudicial statements of Detective Unterbrink who vouched for the credibility of the victim and expressed Detective Unterbrink's personal beliefs regarding whether the crime had occurred.

¶ 61    The defendant's motion stated simply that "[d]uring the interview, Detective Unterbrink makes numerous statements vouching for the credibility of the complaining witness and offers his personal belief regarding the merits of the issues of fact, and that he has no doubt in his mind that 'this' happened, that the incident took place." At the hearing on the defendant's motion, defense counsel identified five instances where Detective Unterbrink either vouched for the credibility of the complaining witness or stated his personal belief regarding the issues of fact in the case. The defendant complained of the following statements made by Detective Unterbrink: that there was no doubt in his mind that the incident occurred, stated twice; that the defendant touched the victim's vagina; that "what happened, happened," and that the defendant held the answers as to

26

why it happened; and, that Detective Unterbrink did not believe the defendant's statements. The defendant argues on appeal that the evidence was not relevant, that the evidence could have been presented by less prejudicial means, and that he was denied a fair trial where the evidence was more prejudicial than probative.

¶ 62    To preserve an issue for appeal, a defendant must both object to the purported error at trial and include it in a written posttrial motion. *People v. Glasper*, 234 Ill. 2d 173, 203 (2009). In a criminal case, however, a defendant who raises his objection in a proceeding on a motion *in limine* need not object again during the trial. *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 43. The defendant raised the issue in his February 18, 2022, motion *in limine* and in his March 31, 2022, motion for new trial. Therefore, this issue is preserved for appeal.

¶ 63    A trial court's ruling on a motion *in limine* regarding the introduction or exclusion of evidence will not be disturbed on appeal absent an abuse of discretion. *People v. Richter*, 2012 IL App (4th) 101025, ¶ 97. A trial court abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the trial court's view. *People v. Inman*, 2023 IL App (4th) 230864, ¶ 10.

¶ 64    Our supreme court has stated that, "when deciding whether to exclude certain evidence, the proper consideration is whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *People v. Walker*, 211 Ill. 2d 317, 337-38 (2004). As such, even relevant evidence may be excluded where its probative value is substantially outweighed by its prejudicial effect. *Id.* Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). "Any statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be

27

used against him as an admission, even if it is not inculpatory or against interest." *People v. Summers*, 353 Ill. App. 3d 367, 374-75 (2004).

¶ 65    Further, statements made by police officers during an interrogation are generally admissible to demonstrate their effect on the defendant, to explain the defendant's responses to questioning, or to explain the course of the interrogation. *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 56. This is so even if the statements themselves would not be admissible as direct testimony. *Id.* Generally, " 'statements made by an investigating officer during an interview with the suspected defendant are admissible if they are necessary to demonstrate the effect of the statement on the defendant or to explain the defendant's response.' " *People v. Wasmund*, 2022 IL App (5th) 190525, ¶ 102 (quoting *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35). Accusations made by police during an interrogation "may be seen as a standard interrogation tactic, rather than an improper opinion." *People v. Moore*, 2012 IL App (1st) 100857, ¶ 52.

¶ 66    In determining whether questions or statements by a police officer during an interrogation of the defendant are admissible, a trial court should consider (1) whether the officer's questions or statements would be necessary for the jury to understand the effect of the statements on the defendant or explain the defendant's responses and (2) assuming the first criteria is satisfied, whether the prejudicial effect of the officer's statements substantially outweighs their probative value. *Wasmund*, 2022 IL App (5th) 190525, ¶ 102. While the defendant is correct that opinions as to a defendant's guilt or innocence are not admissible (*People v. Crump*, 319 Ill. App. 3d 538, 542 (2001)), Illinois courts have drawn a distinction between opinions at the time of trial and past opinions expressed during an investigation. See *People v. Hanson*, 238 Ill. 2d 74, 101 (2010); *People v. Suggs*, 2021 IL App (2d) 190420, ¶¶ 17-18. A past statement during an interrogation

indicates a belief at the time of the interrogation, and not a belief at the time of trial. See generally *People v. Degorski*, 2013 IL App (1st) 100580, ¶ 84.

¶ 67 The defendant argues that Detective Unterbrink's statements should have been edited out of the exhibit published to the jury because they were irrelevant. The defendant argues that a redacted video, or the live testimony by Detective Unterbrink about the interrogation, would have been a suitable alternative to playing the video of the same.

¶ 68 The State did not seek to admit Detective Unterbrink's past statements during the interrogation to prove the defendant was guilty. At the hearing on the motion *in limine*, the State indicated to the trial court that the video was the best evidence of exactly what the defendant had stated during the interview and that the comments of Detective Unterbrink were an interview tactic used in an attempt to elicit responses from the defendant. The State argued that, along with Detective Unterbrink's statements, the jury would be able to view the defendant's responses, such as denying an accusation. The State represented to the trial court that the video was the best evidence of what happened during the interview instead of calling Detective Unterbrink to explain what occurred because the contested evidence was offered for the purpose of allowing the State to show the investigative process and the defendant's reactions to the questions posed by Detective Unterbrink.

¶ 69 Defense counsel stated at the hearing that he had "no issue with the statements made by the defendant." Defense counsel did not argue the relevancy of Detective Unterbrink's statements, and instead argued that if the statements were relevant, their probative value was substantially outweighed by the danger of unfair prejudice to the defendant.

¶ 70 Defense counsel had no issue with the defendant's responses, several of which were to deny Detective Unterbrink's accusations. Without Detective Unterbrink's statements, the meaning

29

and significance of the defendant's responses would have been difficult to discern. Detective Unterbrink's statements were necessary to place the defendant's reactions and responses in context. Thus, we find that Detective Unterbrink's statements satisfy the first criteria, as they were necessary for the jury to understand the effect of the statements on the defendant and explain the defendant's responses.

¶ 71 The second criteria requires a determination of whether the statements made by police during an interrogation, like any other evidence, should be excluded where their prejudicial effect substantially outweighs their probative value. *McCallum*, 2019 IL App (5th) 160279, ¶ 56. While the defendant argues that the video was more prejudicial than probative, the interview portion of the video was relatively short, approximately 17 minutes in total, and consisted of the defendant offering his version of events, possible motive for the victim to lie, and denying Detective Unterbrink's accusations. Detective Unterbrink did not express any opinion or discuss the facts of the case until the last couple of minutes of the interview. Detective Unterbrink did so in the context of asking the defendant to explain any possible reason for his behavior or to disclose more of what occurred on the day of the alleged incident. Detective Unterbrink was calm and did not raise his voice or change his posture during the interview and did not threaten or coerce the defendant.

¶ 72 Because Detective Unterbrink's statements during the defendant's interrogation placed the defendant's statements and behavior into context, we find that their probative value was not substantially outweighed by their prejudicial effect. As such, we find that the admission of the entirety of the video was not arbitrary, fanciful, or unreasonable or such that no reasonable person would take the trial court's view. Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's pretrial motion to exclude or redact the video recording of the defendant's interview.

B. Exclusion of Impeachment Evidence

¶ 74    Next, the defendant argues that the trial court committed reversible error by preventing him from introducing evidence that C.R.P. made a statement to Justin that she had lied about the defendant in order to break up her mother's relationship with Justin. The defendant argues that the discovery sanction imposed by the trial court barring reference to the statement was improper and prejudicial. First, the defendant claims that no discovery violation occurred. He argues that Justin was properly disclosed as a witness, and that disclosure of specific witness statements is only required if those statements have been reduced to writing. He further argues that no writing existed containing the statement; no motion was properly made by the State requesting notes of his interview with the witness; no order had been entered by the trial court requiring the production of notes; and no *in camera* review of any notes took place as would have been required for the trial court to order the production of the notes to the State. Furthermore, the defendant argues that even if we conclude that a discovery violation occurred, the trial court's sanction was too harsh, and the exclusion of the evidence prejudiced him. The defendant filed a motion to reconsider the exclusion of the evidence, provided an offer of proof during trial after the testimony of C.R.P. and Justin, and raised the issue in a posttrial motion, thereby preserving the issue for review.

¶ 75    The State argues that because the defendant disclosed Justin's anticipated testimony on the eve of trial regarding the alleged statement by C.R.P., it could not have requested notes from defense counsel's interview of Justin earlier in the proceedings. The State contends that its request to review the notes during the hearing on its motion *in limine* to bar reference to the statement was proper, and that the notes were discoverable as memoranda. The State argues that defense counsel's evasiveness at the hearing on the motion *in limine* to bar the statement, where he could not provide an exact date for the interview of Justin and did not offer to provide notes until a mid-

trial hearing on his motion to reconsider exclusion of the statement the next day, was a discovery violation. The State further argues that the sanction imposed by the trial court for the violation was appropriate where a continuance was impractical in light of the defendant's speedy trial demand and COVID-19 restrictions; the excluded evidence was not substantive but rather was additional impeachment evidence; the sanction was limited, only barring reference to the evidence that was disclosed on the eve of trial; the State would have been prejudiced if the trial court had not excluded the statement, as it would not have had time to investigate the statement or find rehabilitative evidence; and defense counsel did not act in good faith. Finally, the State argues that any error was harmless, as the result of the trial would not have been different had the statement been included.

¶ 76                                                      1. *Discovery Violation*

¶ 77     We first address whether a discovery violation occurred. Because the dispositive facts giving rise to the alleged discovery violation are not in dispute, the threshold question of whether the defense committed a discovery violation is a question of law which we review *de novo*. *People v. Ramsey*, 239 Ill. 2d 342, 424 (2010).

¶ 78     Initially, we note that the trial court did not indicate the specific conduct for which it determined a discovery violation had occurred. It stated at the February 28, 2022, hearing on the State's motion *in limine* to bar the statement that the motion was granted because the defense was not "in compliance with Illinois law or Illinois rules." It also expressed concern as to why defense counsel chose to operate "in that fashion" regarding the timing of the disclosure. At the hearing on the defendant's motion to reconsider, which occurred the next day, the trial court stated that its ruling would stand, explaining that the ruling was not solely based on the untimeliness of the disclosure, but "was based on the totality and entirety of this case, orders, and Illinois law." The trial court noted that there had been numerous pretrial hearings and multiple requests, including

32

requests by the trial court, to ensure all required discovery was completed. The trial court stated that, "on the eve of trial and even during trial, you chose to act in that fashion. Therefore, under those circumstances, the Court thinks it has no other choice. The way you have acted in proceeding to continue, with the Motion *in Limine*, so the Motion *in Limine* will stand."

¶ 79 Disclosure by the defendant to the State is governed by Illinois Supreme Court Rule 413, which provides, in part, as follows:

"(d) Defenses. Subject to constitutional limitations and within a reasonable time after the filing of a written motion by the State, defense counsel shall inform the State of any defenses which he intends to make at a hearing or trial and shall furnish the State with the following material and information within his possession or control:

(i) the names and last known addresses of persons he intends to call as witnesses, together with their relevant written or recorded statements, including memoranda reporting or summarizing their oral statements, and record of prior criminal convictions known to him; and

(ii) any books, papers, documents, photographs, or tangible objects he intends to use as evidence or for impeachment at a hearing or trial;

\*\*\*

(e) Additional Disclosure. Upon a showing of materiality, and if the request is reasonable, the court in its discretion may require disclosure to the State of relevant material and information not covered by this rule." Ill. S. Ct. R. 413 (eff. July 1, 1982).

¶ 80    As the parties' arguments focus on the disclosure of the notes relating to the alleged statement made by C.R.P. to Justin, we begin our analysis with respect to the disclosure of defense counsel's notes.

¶ 81                                    a. Disclosure of Notes

¶ 82    In a criminal case, defense notes from witness interviews can be discoverable, but only in limited circumstances and only where the proper procedure has been followed. When the notes relate to a defense witness, they can be discoverable under Rule 413(d)(i), which requires defense counsel to provide witness information including "their relevant written or recorded statements, including memoranda reporting or summarizing their oral statements." Ill. S. Ct. R. 413(d)(i) (eff. July 1, 1982). If the notes contain a statement of the defense witness, then that portion of the notes must be disclosed under the rule. *Id.*

¶ 83    Defense counsel's notes from interviews of either defense or State witnesses can also be discoverable under Rule 413(e) upon a showing of materiality and reasonableness, in the court's discretion. Ill. S. Ct. R. 413(e) (eff. July 1, 2982). In *People v. Boclair*, 119 Ill. 2d 368 (1987), the defendant objected to the State's request pursuant to Rule 413(d)(ii) that he produce notes of his investigator that were prepared during interviews of State witnesses, arguing that the notes were not subject to pretrial discovery and were work product. *Id.* at 371-72. The trial court granted the State's request pursuant to both Rule 413(d)(ii), which requires that any papers to be used for impeachment be produced, and Rule 413(e). *Id.* at 373. Our supreme court found that the word "papers" as set forth at Rule 413(d)(ii) could not be defined to include the notes at issue. Nevertheless, the notes were discoverable under Rule 413(e). *Id.* at 374-75. The supreme court explained that the notes were relevant because disclosure would prevent the State from being "surprised by the inconsistent statements of its witnesses" and production of the notes would

"allow the State to prepare for impeachment and to rehabilitate its witnesses or restructure its case if necessary." *Id.* at 375. However, because the notes could contain privileged material including work product, the proper procedure was for the notes to be reviewed *in camera*, and any irrelevant and privileged matter excised, so that the defendant would turn over only that portion of the notes that included the witness's own words. *Id.* at 376. Because the notes were material and relevant to the legitimate ends of discovery, our supreme court concluded that the trial court did not abuse its discretion by examining the notes and ordering the appropriate sections disclosed to the State. *Id.*

¶ 84    In this case, Justin was a witness for the defense. As referenced above, notes of defense counsel's interviews of its own witnesses can be discoverable under Rule 413(d)(i), and defense counsel has a duty to disclose the notes upon motion of the State pursuant to Rule 413(d)(i), but only to the extent that the notes contain the oral statement of the witness. Ill. S. Ct. R. 413(d)(i) (eff. July 1, 1982). If no oral statement is set forth in the notes, 413(d)(i) does not apply. However, notes of an interview by defense counsel of either a defense or State witness can still be discoverable under Rule 413(e), but only upon a showing by the State that the notes are material and that the request is reasonable. Even then, an *in camera* review by the trial court is required for a determination as to whether the notes contain discoverable material. *Boclair*, 119 Ill. 2d at 375.

¶ 85    The trial court in this case did not conduct an *in camera* review of the notes at issue. The first time the notes were mentioned was at the hearing on the State's motion *in limine* to bar reference to the alleged statement. Defense counsel represented to the trial court that he had no writing relating to Justin's statement other than some notes from Justin's interview. The State asked the trial court to order the notes to be produced, and defense counsel offered to produce the notes for *in camera* review. Rather than reviewing the notes *in camera*, the trial court barred reference to the alleged statement by C.R.P. as a sanction for defense counsel's failure to comply

35

with its orders and Illinois law.

¶ 86    At the hearing on the motion to reconsider that ruling, defense counsel explained that he had reviewed the notes, and he represented to the trial court that the notes did not contain any verbatim statements of the witness. He also informed the trial court that the interview where the notes had been created took place on January 10, 2022. The trial court did not change its ruling and again reiterated that the sanction barring Justin's testimony regarding C.R.P.'s alleged statement was based upon the failure by the defense to comply with the trial court's orders and the law. No further specificity was offered to explain the trial court's reasoning for the sanction.

¶ 87    The only information in the record regarding the substance of the notes is the representation of defense counsel at the hearing on the motion to reconsider. He stated that the notes did not contain the verbatim statement of Justin and offered the notes for *in camera* review. The trial court declined to review the notes and upheld its prior ruling. Under these facts, there is nothing in the record indicating that the notes contained discoverable material. Accordingly, we find that the defendant did not violate Rule 413(d)(i) or Rule 413(d)(ii) for failure to provide the State with the notes of its interview with Justin.

¶ 88                                    b. Disclosure of Statements

¶ 89    We next determine whether defense counsel had an obligation to disclose the verbal statement of Justin to the State in the absence of a writing containing that statement. Generally, there is no duty for parties to reduce a witness's oral statements to writing absent a showing of bad faith, and a witness may not be disqualified from testifying simply because the party did not draft a memoranda of a pretrial, oral statement. *People v. Fleming*, 155 Ill. App. 3d 29, 40 (1987).

¶ 90    In this case, the record contains four certificates from defense counsel indicating it had tendered discovery responses to the State. The certificates are dated September 8, 2020, March 10,

36

2021, January 14, 2022, and February 24, 2022. The responses themselves do not appear in the record, but the State represented to the trial court at the hearing on the motion to reconsider that the discovery response of September 8, 2020, listed Justin as a defense witness. The State also indicated at that hearing that it had received a summary of Justin's anticipated testimony in the defendant's January 14, 2022, discovery response. The defense filed witness lists on January 10, 2022, and January 14, 2022, both of which listed Justin as a defense witness.

¶ 91    The State, therefore, had notice as early as September 8, 2020, that the defendant intended to call Justin as a witness. The State had confirmation of that intention on January 10, 2022, and on January 14, 2022. In the context of the multiple disclosures that Justin would testify, as well as providing information regarding the subject of his testimony, the State should have known that defense counsel had likely interviewed Justin.

¶ 92    As noted in the previous section, the State could have filed a motion pursuant to Rule 413(e) asking the trial court to order defense counsel to produce the notes of Justin's interview. The State filed no such motion, and it did not make an oral motion for disclosure of the notes until the first day of trial during the hearing on the motion *in limine* to exclude the statement. Rather than review the notes *in camera* to determine which portion of the notes, if any, were discoverable pursuant to Illinois Supreme Court Rule 413(e), the trial court barred the statement. Therefore, the only evidence in the record regarding the content of the notes is defense counsel's representation that the notes did not contain the statement.

¶ 93    The record does not indicate that any other writing containing the statement existed either. In response to a Rule 413(d) discovery request, the defense has a duty to disclose a defense witness's oral statement, or a statement intended to be offered for impeachment purposes, only to the extent that the statement is contained in a writing or recording. Ill. S. Ct. R. 413(d)(i), (ii) (eff.

37

July 1, 1982). When no writing or recording exists containing the oral statement, the State cannot discover the content of the oral statement pursuant to Rule 413(d).

¶ 94    There is nothing in the record to indicate that any writing existed containing the alleged statement made to Justin by C.R.P. Defense counsel had no obligation to create a writing containing the statement that it would then have to disclose. Because there was no writing containing the statement, and no requirement for defense counsel to create such a writing, defense counsel was not required to disclose the statement. Accordingly, we do not find a discovery violation of Rule 413(e) regarding disclosure to the State of Justin's oral statement to defense counsel.

¶ 95                                2. *Discovery Sanction*

¶ 96    As set forth above, there was no discovery violation concerning the defendant's failure to disclose the oral statement of Justin regarding C.R.P.'s statement or the failure to disclose any notes related to defense counsel's interview with Justin. The trial court stated at the hearing on the State's motion *in limine* that it was granting the State's motion to bar the statement because it believed that defense counsel was not in compliance with "Illinois law or Illinois rules." The trial court's docket entry of February 28, 2022, stated that the State's motion was granted because defense counsel "was not in compliance with court orders or Illinois law." At the hearing on the defendant's motion to reconsider, the trial court stated its ruling was not based on untimeliness alone, but "was based on the totality and entirety of this case, orders, and Illinois law."[5]

---

[5]Although the trial court referenced the fact that its decision to impose the sanction was not based solely upon timeliness, it is noteworthy that on the date of the pretrial conference, February 23, 2022, the State filed its "Amended List of Exhibits," which included the "DVD-R containing audio/video interview of Howard McNece on May 29, 2018." Additionally, the State moved to amend the information to dismiss count II. There was no comment made regarding the State's timeliness.

38

¶ 97    Illinois Supreme Court Rule 415(g) (eff. Oct. 23, 2020) provides that a trial court may exclude evidence for a party's failure to comply with a discovery order or rule. The purpose of a sanction is intended to accomplish discovery, not to punish the offending party. *People v. Scott*, 339 Ill. App. 3d 565, 572 (2003). We review a discovery sanction under an abuse of discretion standard (*People v. Mullen*, 313 Ill. App. 3d 718, 736 (2000)), and a trial court's order excluding evidence as a sanction for a discovery violation will be closely scrutinized on appeal. *People v. White*, 257 Ill. App. 3d 405, 414 (1993).

¶ 98    In this matter, the trial court's statement that its ruling was not based on untimeliness alone suggests that the trial court was also concerned regarding the timing of the defendant's disclosure which had, in part, formed the basis of its decision to bar the statement. However, as determined above, under the circumstances in this case, there was no requirement for the defendant to have disclosed the statement. Thus, there was no discovery violation. The trial court further stated that it had based its determination on "the totality and entirety of this case, orders, and Illinois law," yet failed to state which specific discovery order or "Illinois law" the defendant had violated that formed the basis of its determination that a sanction was appropriate. Thus, we find that the imposition of a sanction was unreasonable where no discovery violation occurred. Accordingly, we find that the trial court abused its discretion in barring the alleged statement made by C.R.P. to Justin as a discovery sanction.

¶ 99    The State argues, however, that even if the sanction was an abuse of the trial court's discretion, it was harmless error. We agree. Under the harmless error analysis, the test is whether, absent the error, a rational jury could have found the defendant guilty beyond a reasonable doubt. *People v. Anderson*, 407 Ill. App. 3d 662, 671 (2011). The only evidence that was excluded was the alleged statement by C.R.P. that during an argument regarding clean up after dinner, C.R.P.

39

said she had done everything she could to break up the relationship between her mother and Justin, including lying about the defendant. During his offer of proof, defense counsel stated that this statement would have been offered not for the truth of the statement, but for the purpose of impeachment with a prior inconsistent statement and to prove motive.

¶ 100   The jury in this case heard evidence regarding that motive. Contrary to C.R.P.'s testimony that she and Justin maintained a good relationship, Justin testified that C.R.P. had a problem with him and they did not get along. He further stated that, for the entire duration of his relationship with C.R.P.'s mother, C.R.P. would cause problems and that she was very hostile at times. Justin also testified that C.R.P. was not comfortable around the defendant, would disagree with the defendant about politics, and that C.R.P. "did things to retaliate against authority figures."

¶ 101   The defense was also permitted to impeach C.R.P.'s credibility through other means. During cross-examination, defense counsel asked C.R.P. to provide a specific, detailed account of how the defendant had changed positions on the couch, and in closing argument emphasized that her explanation did not make sense. Defense counsel also emphasized how C.R.P. had no problem doing a physical demonstration regarding the defendant's location on the couch and his approach toward C.R.P. during the State's case but declined to do so when asked by the defense. Defense counsel also asked C.R.P. about what she had stated in her DCFS interview and emphasized in closing argument that she was unable to recall what she had said when questioned about what she was watching on television. Defense counsel also stressed how C.R.P. testified that she had not been to a soccer game that day and that the incident had lasted 30 to 40 minutes, while others testified that there had been a soccer game that day and that C.R.P. was only in the house for 5 to 10 minutes when the alleged incident occurred. The defense further pointed out that C.R.P. testified that the defendant came into the living room with a bottle of beer, while others testified

that the defendant only drank Keystone Light from a can. Defense counsel also pointed out that C.R.P. had made plans after the incident to go to Six Flags that following weekend, and C.R.P. wore the same shorts she had on from the alleged incident. Defense counsel argued that this was not the behavior of someone who had been improperly touched.

¶ 102   The jury also heard from the defendant, who denied that the events occurred. In closing argument, defense counsel again reiterated that the defendant denied that the events had occurred and stated that the situation was "a he said/she said case without any more proof."

¶ 103   The statement the defendant sought to introduce was for impeachment purposes and to establish motive. There was ample other motive and impeachment evidence introduced at trial and thus, we find that the excluded evidence, while material, was cumulative. Therefore, the outcome of the trial would likely not have been different. Accordingly, we find that the exclusion of the statement was harmless error.

¶ 104                                C. Sidebar Conversations

¶ 105   The defendant argues on appeal that the trial court failed to properly address concerns that the jury could hear discussions between the trial court judge and trial counsel. The record indicates that the defendant informed defense counsel that voices could be heard from the law library during sidebars, but said the exact words could not be heard and the defendant was unsure whether the jury could hear the conversations. When defense counsel brought this to the trial court's attention, the bailiff was summoned. The bailiff acknowledged that voices could be heard from the law library, but "just barely," and that what the voices were saying could not be discerned. He also denied hearing any yelling. The trial court then directed the parties to proceed with the trial. The defendant did not pursue the issue further, and there is nothing in the record indicating that the

41

jury could hear anything that was being said in the law library. The defendant did not revisit the issue at any later point in the trial but did include it in his posttrial motion.

¶ 106   It is appropriate for the trial court to declare a mistrial when there is a manifest necessity for the mistrial or the ends of justice would otherwise be defeated. *Illinois v. Somerville*, 410 U.S. 458, 461 (1973). The granting of a mistrial is within the broad discretion of the trial court. *Id.* at 462. Accordingly, we review the decision of whether to declare a mistrial under an abuse of discretion standard. See *People v. Morgan*, 2025 IL 130626, ¶ 23.

¶ 107   Nothing in the record indicates that the jury was able to hear the substance of the conversations that took place in the law library. When that possibility was brought to the attention of the trial court, it conducted an inquiry and was satisfied that the jury could not hear what was being said during the sidebars. No further mention of the issue was made by the defendant at trial. Because we find nothing in the record to indicate that the jury had been exposed to improper information, there is insufficient evidence to support a determination that the trial court abused its discretion by not declaring a mistrial and allowing the trial to proceed. We therefore find no error with regard to this issue.

¶ 108                                    D. Cumulative Effect of Errors

¶ 109   Finally, the defendant argues that the trial court's denial of his multiple requests for a mistrial amounted to cumulative error that deprived him of a fair trial. He cites four incidents that he argues should have resulted in a mistrial: (1) the trial court's handling of an objection during his opening statement; (2) the trial court's admonishing defense counsel to close a door in the presence of the jury; (3) the trial court allowing a speaking objection relating to a video played for impeachment purposes; and, (4) the jury hearing a portion of the impeachment video's audio during a recess while the video was being prepared to be published.

¶ 110 "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). Generally, there is no cumulative error where the alleged errors do not amount to reversible error on any individual issue. *People v. Green*, 2017 IL App (1st) 152513, ¶ 118. In order to determine cumulative error, we must determine whether any errors occurred.

¶ 111 Whether or not to grant a mistrial is a matter within the trial court's discretion. *People v. Kimble*, 2019 IL 122830, ¶ 36. As previously stated, a trial court abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the trial court's view. *Inman*, 2023 IL App (4th) 230864, ¶ 10.

¶ 112 With regard to the defendant's first two claims involving the trial court's tone, his appellant brief only references those two incidents in his statement of facts. He refers to the trial court's tone in admonishing him during opening statements and to the trial court's tone in telling him to close a door. Regarding the door comment, the defendant states that the jurors heard the trial court's tone and reacted with smirks and giggles. He does not, however, mention either incident in his argument section, nor does he make any argument as to how the trial court's admonishments amounted to error.

¶ 113 Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant to set forth in their argument "the contentions of the appellant and the reasons therefor," and provides that "[p]oints not argued are forfeited." Because the defendant fails to develop his argument regarding the trial court's conduct in any way, we find that any error as to those two claims is forfeited.

43

¶ 114 The defendant's next claim is that the trial court permitted the State to make an improper speaking objection with regard to impeachment of the defendant's wife, Johnnie. An objection is intended only to state the fact of the objection and the evidentiary basis therefor. *People v. Blue*, 189 Ill. 2d 99, 136 (2000).

¶ 115 It is clear from the exchange at issue that it was defense counsel, not the State, who made an objection regarding the impeachment. There is nothing in the record demonstrating that any objection was made by the State at this point in the trial. Further, the State's only comments when responding to the defendant's objection were to repeatedly offer to play the video of the witness, rather than read the statements from a transcript. Because the record does not indicate that any objection was made by the State, let alone an improper speaking objection, we find no error regarding denial of the motion for mistrial based on a speaking objection by the State.

¶ 116 The defendant's fourth claim of error relates to the same moment in trial, where after defense counsel withdrew his objection, the audio of the video was intermittently played during a recess while the jurors remained in the courtroom as the State attempted to locate the testimony it wanted to use during trial. Defense counsel alleges that the jury heard some of the audio from the video during that recess.

¶ 117 The defendant failed to make a record of this event at the time this occurred. When the trial resumed after the brief recess, the defendant did not make any sort of motion or objection, despite the fact that defense counsel subsequently acknowledged that he had heard the audio being played. Indeed, the defense counsel waited until the next day to make a record regarding this issue, and even then, did not provide the trial court with any specific reference to exactly what he heard being played in front of the jury. In criminal cases, a defendant preserves an issue for review by raising it in either a motion *in limine* or a contemporaneous trial objection, and including it in a posttrial

44

motion. *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 45. Because no contemporaneous objection or motion was made at the time of the alleged error in this case, and in fact no record of the alleged incident was made at all until the next day, the defendant has forfeited this issue on appeal.

¶ 118   In summary, we find no error with respect to the defendant's claim that the trial court allowed a speaking objection related to the video played for impeachment purposes. We further find that the defendant's claims of error regarding the trial court's handling of an objection during defense counsel's opening statement, the trial court's admonishment of defense counsel to close a door in the presence of the jury, and the claim that the jury was allowed to hear a portion of an audio recording while the video was being prepared to be published are forfeited. Because there was no error, we hold that cumulative error did not deprive the defendant of a fair trial.

¶ 119                                  III. CONCLUSION

¶ 120   For the foregoing reasons, we affirm the defendant's conviction where the trial court did not abuse its discretion in its rulings regarding the admittance of video evidence, the exclusion of testimony as a discovery sanction was harmless error, there was no cumulative error regarding the trial court's denials of the defendant's motions for mistrial, and all other issues raised by the defendant were forfeited.

¶ 121   Affirmed.